STATE of Missouri, Respondent,

v.

Mack CALHOUN, Appellant.

No. WD 67579.

Missouri Court of Appeals, Western District.

April 15, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 2008.

Application for Transfer Denied Aug. 26, 2008.

Jeannie Marie Willibey, Kansas City, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Shaun Mackelprang and Evan Buchheim, Office of Attorney General, Jefferson City, MO, for respondent.

PAUL M. SPINDEN, Presiding Judge.

Mack Calhoun appeals the circuit court's judgment convicting him of murder in the first degree in violation of Section 565.020.1, RSMo 2000. He contends that the circuit court erred in overruling his motion for judgment of acquittal because the State's evidence was insufficient to support the jury's verdict.

The State presented evidence that, during the pre—dawn hours of March 2, 1989, a truck driver saw Renee Weathersby lying on the ground near the 12th Street bridge in the west "bottoms area" of Kansas City. Weathersby had sustained a gunshot to her head, and she was not fully clothed. Despite the gunshot wound, the driver did not see any signs of bleeding. He returned to his truck and notified the police. When police arrived a few minutes later, a pool of blood had begun forming around Weathersby's head.

During an autopsy of Weathersby's body, a police detective found a dried substance on Weathersby's left buttock. The medical examiner determined that the substance was semen. The medical examiner sealed a sample of the semen in a plastic tube.

About 14 years later, during 2003, the Kansas City Crime Laboratory performed DNA testing on the semen. The test indicated that Calhoun was the semen's source. Police interviewed Calhoun, but he denied any involvement of any kind with the victim. He maintained his denials even after police told him that his DNA was found on her body.

In appealing his conviction, Calhoun first asserts that the circuit court erred in overruling his motion for judgment of acquittal because the State's evidence was insufficient to support the jury's verdict. At most, Calhoun argues, the State proved that he had sexual relations with Weath-

ersby at some unknown time before her murder during 1989.

■ Our review of whether or not the circuit court erred in overruling Calhoun's motion for judgment of acquittal is limited to determining whether or not the evidence was sufficient to persuade a reasonable juror, beyond a reasonable doubt, of each of the crime's elements. *State v. Redifer,* 215 S.W.3d 725, 730 (Mo.App. 2006). We do not weigh the evidence or judge the witnesses' credibility. We review the evidence in a light most favorable to the verdict and disregard all contrary evidence. *Id.* at 730–31.

The State charged Calhoun with first—degree murder, in violation of Section 565.020.1, RSMo 2000. This statute says, "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." In its indictment, the State alleged that, "between and including March 1, 1989 and March 2, 1989, in the County of Jackson, State of Missouri, the defendant, after deliberation, knowingly caused the death of [Weathersby] by shooting her." Calhoun claims that the State failed to make a submissible case as to each proof element because the State's evidence established only that he had sexual intercourse with Weathersby.

■ Calhoun acknowledges that a police criminalist, Kristine Olsson, testified that he had emitted the semen found on Weathersby's left buttock. Olsson testified that the semen's location indicated that Weathersby was lying on her back during sexual intercourse. Olsson opined that, because gravity had not caused the semen to flow down Weathersby's leg, she could not have been mobile for more than 15 minutes after sexual intercourse. Olsson also testified that blood splatters on Weathersby's face indicated she was lying on her back when she was shot. Coupling this evidence with evidence that police found Weatherby's underwear near her body, the jury could have inferred reasonably that Weathersby was lying on her back during the sexual intercourse and when she was shot.

Calhoun concedes that Olsson's testimony supported a finding that Weathersby was lying on her back during both events but claims that the State did not present evidence suggesting that the events occurred close together in time. Calhoun contends that nothing excludes the possibility that he had sexual intercourse with Weathersby and left the scene and that Weathersby continued to lie on the ground afterward when someone came along and shot her.

Calhoun's having sexual intercourse with Weathersby but leaving before she was shot is a possibility, but the evidence, viewed in a light most favorable to the jury's verdict, established a sound basis for the jury's concluding to the contrary. The sexual intercourse occurred near an industrial area under the 12th Street bridge in the "bottoms area" west of downtown Kansas City. The jury could have inferred reasonably that Weathersby would not have continued to lie outside, exposed, under the bridge unless she was dead or seriously debilitated. Furthermore, Cindy Rogers, a police officer, testified that, on the night of the murder, the air temperature was 26 degrees. From this, the jury could have inferred reasonably that the air was too cold for Weathersby to continue to lie outside with barely any clothing on unless she was dead or seriously debilitated.

More telling, perhaps, was the testimony of Eldred Fansher, the truck driver who found the victim. He said that, when he walked up to Weathersby, she was lying on the ground and appeared to be dead. She

had sustained a gunshot wound to the head, he said, but she was not bleeding. He also testified that he did not see anyone else in the area. When police arrived a few minutes later, they found blood around the victim. From this evidence, the jury could have inferred reasonably that Weathersby had been shot moments before Fanscher found her because she was just starting to bleed when Fanscher found her. Because of clear evidence of Calhoun's having sexual intercourse with her, the jury could have inferred reasonably that he was the last person to see her alive and had shot her.

In addition, Calhoun's statement to police supported the jury's verdict. During the interview, the police showed Calhoun a photo of Weathersby and told him her name. Calhoun denied knowing her and consistently repeated this denial during the interview. Even after police informed Calhoun that his DNA was found on her, he repeatedly denied knowing her or having sex with her. Calhoun insisted that, not only had he never had sex with her under the 12th Street bridge, he had never been anywhere near the bridge. During the interview, Calhoun also excluded the possibility of a chance sexual encounter by telling police that he was not in the habit of "picking up women in clubs." He told police that he clearly remembered the period and never consumed any drugs or alcohol that would have impaired his ability to remember any incidents involving Weathersby. At trial, however, Calhoun's defense was that he had a chance sexual encounter with Weathersby but did not murder her. The jury could have further inferred Calhoun's guilty from his statements to police compared to his admission at trial. *State v. Smith,* 11 S.W.3d 733, 737 (Mo.App.1999).

Although none of these facts alone would be sufficient to establish, beyond a reasonable doubt, that Calhoun murdered Weathersby, the totality of the evidence was sufficient to support the jury's verdict. Indeed, Calhoun's counsel conceded at oral arguments that this evidence would, in most cases, be sufficient to convict. Counsel complained primarily that Olsson's testimony should be afforded no weight on the basis that it did not have a sufficient scientific foundation because it was based solely on the examination of one photograph of the victim.

This argument, however, misses the critical distinction between admissibility and submissibility of evidence:

If a question exists as to whether an expert witness's opinion testimony is supported by a sufficient factual or scientific foundation, the question is whether the expert witness's testimony is admissible.... It must be raised by a timely objection or motion to strike.... Once the testimony has been admitted, it may be relied upon for purposes of determining whether a submissible case has been presented.... The jury decides what probative value, if any, the testimony carries.

*State v. Jackson,* 186 S.W.3d 873, 883 (Mo. App.2006) (quotation marks omitted). That Calhoun now views Olsson's testimony as inadmissible is irrelevant to the issue of whether or not the State made a submissible case.

In his second point, Calhoun claims that the circuit court erred in allowing the State to elicit Olsson's conclusions about the effect of gravity on the semen found and the flow of blood from her body because the State did not demonstrate that these facts were outside the realm of an average juror's knowledge. Calhoun is not arguing that Olsson was unqualified to state her opinions or lacked a sufficient foundation to give the opinions. His claim

is that Olsson's conclusions invaded the jury's province because the jurors had the knowledge to draw the same conclusions.

■ Calhoun concedes that he did not object to any of Olsson's conclusions, but he requests plain error review under Rule 30.20. Rule 30.20 grants us authority to consider "[p]lain errors affecting substantial rights . . . when [we find] that manifest injustice or miscarriage of justice has resulted" from the plain error. The rule presents a bit of a conundrum by granting us authority to review plain error only if we find manifest injustice or a miscarriage of justice. Making a finding of manifest injustice or a miscarriage of justice seems tantamount to a review, but the Supreme Court suggested in *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995), that it intended that we should first examine for plain error by reviewing the record "facially" and to grant plain error review only if we discerned a substantial ground for believing that manifest injustice or miscarriage of justice has resulted from plain error. If we find that the plain error claim does not establish facially substantial grounds for believing that manifest injustice or miscarriage of justice has occurred, we should decline to exercise our discretion to review a claim of plain error under Rule 30.20. "The rule makes it clear that not all prejudicial error—that is, reversible error—can be deemed plain error." *State v. Dowell,* 25 S.W.3d 594, 606 (Mo.App.2000). Plain error is evident, obvious, and clear error. *State v. Wallis,* 204 S.W.3d 732, 735 (Mo. App.2006).

■ Well—established law states that " 'expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclu-

sion from the facts in evidence.' " *State v. Faulkner,* 103 S.W.3d 346, 360–361 (Mo. App.2003). In a criminal case, an expert may testify concerning his or her opinion on an ultimate issue, but the testimony must aid the jury and not invade the jury's province. *Id.* at 361. Calhoun argues that Olsson was in no better position than the jury to make her conclusions; therefore, her testimony invaded the jury's province. To succeed on this point, Calhoun had to establish that Olsson's not being in a better position than the jury to draw the conclusions was evident, clear and obvious from the record.

Olsson testified that, "following ejaculation into the vaginal cavity . . . when the person stands up . . . gravity will start to take effect almost immediately and some drainage [of semen] will begin almost immediately." Olsson added that, "based on the crime scene reports and samples that were collected and my testing, [a trail of semen] appears to be flowing upward . . . in a direction toward [Weathersby's] head." Olsson also testified that semen normally does not flow up a woman's buttocks. Concerning the direction of the semen's flow, she said:

[It] indicates . . . that from the deposition of semen there's not an opportunity for gravity to take over and let the semen flow out naturally as it would. It appears that [the victim] was not in an upright position for a significant length of time following the deposition of that semen, which allowed it to flow out into this sort of pattern.

She further testified that the semen deposited was a significant amount because one "can actually see visible liquid flowing down onto the skin" and the absence of semen in the victim's underwear indicated that it was "not put back on following this ejaculation." She added that, "looking at the flow of semen from the vaginal area

... and the gunshot wounds to the head, ... her position is likely on her back for an amount of time following both these incidences." Based on the physical evidence, Olsson concluded that the victim did not rise for more than 15 minutes after having sexual intercourse and the simultaneous occurrence of sexual intercourse and the shooting was "possible."

We reject Calhoun's assertion that the circuit court should have struck this testimony, *sua sponte*, because it was within the knowledge of an average juror. Although Calhoun is technically correct that an average person understands gravity, it is not evident or clear that an average person would be able to apply that generalized understanding to the facts of Calhoun's case and draw the conclusions that Olsson did. The circuit court did not plainly error in admitting Olsson's testimony.

■ In his third point, Calhoun claims that the circuit court erred in not striking, *sua sponte*, a statement by the prosecuting attorney during rebuttal argument. The prosecuting attorney argued to the jury, "I'm telling you, he shot her. He shot her. That ought to fill it." Calhoun asserts that this argument improperly implied that the prosecuting attorney had personal knowledge that Calhoun shot the victim. Calhoun concedes that he did not object to this statement, and he requests plain error review pursuant to Rule 30.20.

■ Well—established law provides that comments made during closing arguments rarely will constitute plain error because trial strategy is an important part of closing arguments. *State v. Bennett*, 201 S.W.3d 86, 88 (Mo.App.2006). Moreover, any claim of error suggesting that the circuit court should have interrupted a party's closing argument *sua sponte* overlooks the possibility that Calhoun's attor-

ney did not object for strategic reasons. *Id.* In the absence of an objection, the circuit court's options are "'narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.'" *Id.* (citations omitted). "A party cannot fail to request relief, gamble on the verdict, and then, if adverse, request relief for the first time on appeal." *Id.* Hence, plain error in a closing argument should occur only if the appellant can establish that the improper statements in the closing argument resulted in manifest injustice by having a decisive effect on the jury's determination. *Id.* at 88–89. As a practical matter, these claims are generally denied without explanation. *State v. Collins*, 150 S.W.3d 340, 349 (Mo.App. 2004).

■ A prosecuting attorney may base his or her arguments on reasonable inferences from the evidence and may make arguments regarding the witnesses' credibility so long as the arguments are based on the evidence. *State v. Vanlue*, 216 S.W.3d 729, 734 (Mo.App.2007). "'The golden thread running though all the cases on this subject is an inquiry into whether the prosecutor's statement of his [or her] belief appears to be based on the evidence which has been introduced before the jury.'" *State v. Brown*, 231 S.W.3d 268, 272 (Mo.App.2007) (citation omitted).

At the beginning of his rebuttal argument, the prosecuting attorney said:

If it were only that simple, then we wouldn't have anybody in prison. You've got to have somebody come in and say[, "S]o—and—so shot her.["] Well, I've got all this physical evidence; I don't care, and they don't care. One person to come in and say[, "H]e shot her.["] *I'm telling you he shot her. He*

*shot her. That ought to fill it.*[1]

The prosecuting attorney's speaking in the first person did not automatically inject personal belief into an argument. *State v. Mishler,* 908 S.W.2d 888, 894 (Mo.App. 1995). He did not make any express or implicit statements that he had personalized knowledge of Calhoun's guilt. *Id.* He was asserting that he could tell the jury that Calhoun shot the victim because of all the physical evidence in the case—not because he had extrajudicial knowledge of his guilt. After making the statement, he extensively reviewed the physical evidence that implicated Calhoun. We decline plain error review.

We affirm the circuit court's judgment to convicting Calhoun of murder in the first degree.

JAMES M. SMART, JR., Judge, and THOMAS H. NEWTON, Judge, concur.