**STATE of Missouri, Respondent,**

v.

**Terry A. BLAIR, Appellant.**

**No. WD 69602.**

Missouri Court of Appeals,
Western District.

Aug. 18, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 27, 2009.

Application for Transfer Denied
Dec. 22, 2009.

Frederick Joseph Ernst, Assistant State Public Defender, Kansas City, MO, for Appellant.

Shaun J. Mackelprang, Evan J. Buchheim, Assistant Attorneys General, Jefferson City, MO, for Respondent.

Before JOSEPH M. ELLIS, P.J., JAMES E. WELSH, J., and ZEL M. FISCHER, SP.J.

ZEL M. FISCHER, Special Judge.

This case involves the appeal of six separate murder convictions and six consecutive sentences of life without parole that resulted from a single bench trial. The issues raised on appeal are: (1) sufficiency of the evidence to support the convictions; (2) whether the trial court made inappropriate findings not supported by the record; and (3) whether the trial court erred in not suppressing the statements of the defendant based on the failure of the police to preserve the audio-visual recording of the interrogation. The judgment is affirmed.

### General Facts

In December 2004, Terry A. Blair was charged in Jackson County circuit court with eight charges of first-degree murder, § 565.020, RSMo 2000, for the 2004 mur-

ders of eight women in Kansas City, Missouri. Blair was also charged with first-degree assault, § 565.050, RSMo 2000, and three charges of forcible rape, § 566.030, RSMo 2000.

Prior to trial, the State and Blair reached an agreement in which the State would dismiss two of the murder charges, dismiss the assault and forcible rape charges, and not seek the death penalty. In exchange, Blair agreed to permit admission of a witness' statement if she could not be located to testify at trial.

Blair waived his right to a jury trial, and on March 27, 2008, after a bench trial, the trial court found Blair guilty of the murders of Sheliah McKenzie, Patricia Wilson, Carmen Hunt, Anna Ewing, Darci Williams, and Claudette Juniel. On April 24, 2008, the trial court entered judgment and sentenced Blair to six consecutive sentences of life imprisonment without the possibility of parole.

Blair contests the sufficiency of the evidence to support his convictions. To avoid repetition, the general evidence, in a light most favorable to the verdict, is presented here. Specific evidence relating to each murder is included with the corresponding analysis.

### a. Summer 2004

Throughout the summer of 2004, Blair stayed with his mother, who lived at 2449 Prospect, and with his sister, who lived at 1340 West Bluff. The man living above Blair's mother often let prostitutes eat, sleep, and shower at his apartment. Blair's grandmother lived nearby at 2454 Olive.

### b. Anonymous 911 Calls

On September 3, 2004, at approximately 10:39 p.m., an unidentified male made a 911 call from a deactivated cell telephone without a SIM card (meaning no number was attached to identify the telephone making the call) to report a dead body at 29th and Park. (This body would later be identified as Carmen Hunt). At trial, a linguistics professor identified the 911 caller as an urban, native-English-speaking, African–American male in the lower-middle to upper working class.

The caller told the 911 dispatcher that the body was in the back yard at the northeast house on the corner. When asked how he knew there was a dead body there, he said, "I put it there." The caller refused to identify himself. When he was asked a second time how he knew the body was there, the man stated, "Because I put the two on 25th and Montgall, and I put that there." (In context, the caller is referring to the bodies of Sheliah McKenzie and Patricia Wilson).

The caller told the dispatcher the body at 29th and Park was in the back yard of an abandoned house on the corner and that it was "all the way to the fence by the alley, buried up under tree branches. It's been there for about two months." The caller said he did not know the victim's name, but knew she was a prostitute.

The caller again confirmed that he killed the other two prostitutes whose bodies were found at 25th and Montgall and then hung up.

On September 4, 2004, at 6:51 p.m., the same unidentified man, using the same cell telephone, called 911. The caller told the 911 dispatcher that he had called the day before to "report bodies" and that he was calling again to report "two more bodies."

The caller stated that one body was at 24th and Prospect "in the alley right next to the gate by the U–Haul place" and was covered by "black vinyl." (This body would later be identified as Darci Williams). The caller stated the other body was at 27th and Olive and covered with brush and pillows. (This body would

later be identified as Claudette Juniel). The caller said the victims were prostitutes and that he killed them because they were "scum" and a "disgrace." The caller refused to give his name, but told the dispatcher that the body at 27th and Olive had been there for about six weeks and that the one at 24th and Prospect had been there only a week. The caller told the dispatcher, "you can smell her." The caller told the dispatcher that he did not know the victims' names, but that he was killing these women because they were prostitutes.

The caller went on to tell the dispatcher that he put the two bodies at 26th and Montgall (McKenzie and Wilson), and when asked if there were other victims, the caller mentioned the body found at 23rd and Prospect (Anna Ewing), but said that "they find [sic] her long time ago."

The cell telephone used to make these two calls, as well as a 911 hang-up call on August 30, 2004, was a T–Mobile cell telephone stolen from a maintenance company. Although the telephone did not have an internal SIM card, all phones have an International Mobile Equipment Identifier and a feature that always allows a cell telephone to dial 911. No further calls were attempted from this cell telephone after it was reported that police were attempting to track the location of the caller.

Officers made "test calls" with a T–Mobile cell telephone from Blair's mother's apartment and Blair's sister's duplex in an attempt to determine the location of the 911 caller. The officers' tests showed that the September 3rd call originated from the south of a cell tower at 18th Street and Prospect. Blair's mother's apartment was directly south of this tower. The August 30th hang-up call and the September 4th call both originated from the north of a tower located at 3330 Roanoke. Blair's

sister's duplex at 1340 West Bluff is directly north of this cell-phone tower.

During the September 4, 2004, 911 call, the sounds of children playing and a train horn could be heard in the background. There are two playgrounds within a short distance of Blair's sister's housing complex, including one just behind her residence. Blair's sister's duplex is also located near several sets of railroad tracks. Train records and GPS coordinates show that a train blew its horn at 6:53 p.m. on September 4, 2004 (the 911 call that night started at 6:51), in a location near Blair's sister's duplex. At trial, a friend of Blair's testified that it was possible to hear the trains from Blair's sister's duplex.

#### c. Blair's Arrest

On September 6, 2004, Cherry Chadbourne flagged down police and told them that Blair told her he was going to kill all prostitutes one by one because they were the scum of the earth. Earlier that summer, Blair paid Chadbourne for sex. Chadbourne also told police that Blair had been stalking her and told her what she had been wearing the previous week. Blair also told Chadbourne he killed his first wife because she had become a prostitute.

On September 10, 2004, Blair was at a friend's house when his picture was featured in a newscast as a person of interest in a string of murders committed along the Prospect corridor. Blair's friend pretended she did not recognize him as the person of interest. When Blair left her house, she called the police. Blair later returned to his friend's house and hid in the garage. Police found Blair between the rear of a car and the back of the garage.

After his arrest, Blair received the *Miranda* warnings and agreed to talk to police. Blair was shown pictures of five of the victims. Blair denied having contact

with any of the victims or being at any of the locations where the bodies were found.

Blair would later state that he recognized Darci Williams and that he had seen her ten or eleven days earlier. Blair denied ever having sex with Williams. Blair also denied ever having sex with any of the victims or any prostitute except for a woman named "Peaches" whom he paid for sex in 2002.

Blair also denied that he had made the anonymous 911 calls. Blair told police that on September 3 and 4, 2004, when the calls were made, he helped his mother move out of her apartment and stayed with his sister (thus placing him in the areas from where the 911 calls were made).

## I.

**Sufficient evidence exists to support all six of Blair's convictions for first-degree murder**

Blair alleges insufficient evidence supports all six of his convictions for first-degree murder. Blair alleges that the DNA evidence admitted by the State fails to identify him as McKenzie's killer. Blair further extrapolates that because the State's DNA evidence failed to identify him as McKenzie's killer, that there was insufficient evidence to support his conviction for murdering any of the six victims because the DNA evidence was the only direct association between Blair and any of the victims. Blair also argues that the court made impermissible inferences, unsupported by the evidence, to conclude that McKenzie's last conscious act was intercourse with Blair before he killed her.

### a. Standard of Review

■ When considering a claim that alleges insufficient evidence to support a conviction, an appellate court's review is limited to determining whether the evidence is sufficient for a reasonable juror to find each element beyond a reasonable doubt. *State v. Freeman,* 269 S.W.3d 422, 425 (Mo. banc 2008). The sufficiency of the evidence in a court-tried case is determined by the same standard as in a jury-tried case. *State v. Downen,* 3 S.W.3d 434, 435 (Mo.App.1999).

■ This Court does not review the evidence de novo; rather it considers the record in the light most favorable to the verdict. *State v. O'Brien,* 857 S.W.2d 212, 215–16 (Mo. banc 1993). Moreover, this Court does "not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *Freeman,* 269 S.W.3d at 425 (internal citations and quotations omitted). As a result, this Court does not act as a "super juror" with veto powers; instead it gives great deference to the trier of fact. *State v. Grim,* 854 S.W.2d 403, 414 (Mo. banc 1993).

### b. The record supports the determination that Blair was the anonymous 911 caller

■ At the outset of this analysis, it is especially helpful to establish that sufficient evidence supports the trial court's finding of fact that Blair was the 911 caller. This is because at trial and oral argument, it was conceded that one person killed all six victims. In its judgment, the trial court observed this when it noted, "[a]s everyone involved has stated, identify the caller because he must also be the killer." In this regard, however, it is important to remember that this factual determination was merely one factual finding that was used cumulatively with all the other evidence to prove guilt beyond a reasonable doubt.

At trial, a linguistics professor identified the 911 caller as an urban, native-English-speaking, African–American male in the lower-middle to upper working class. Blair fits this description.

Test calls made by police establish that the caller and Blair were in the same vicinity when the calls were made. The August 30th and September 4th calls originated from a cell phone tower located at 3330 Roanoke. This tower is directly south of Blair's sister's duplex at 1340 West Bluff. Out of seven test calls made from Blair's sister's duplex, three calls originated from the Roanoke cell tower and reported the identical longitude and latitude of as the anonymous 911 calls made from Blair's sister's residence.

Other evidence places the calls in the vicinity of Blair's sister's duplex. There are two children's playgrounds within a short distance of the duplex, and the sound of children playing can be heard in the background of the call. The duplex is also near train tracks. A train horn can be heard in the call. Evidence from a train's onboard computer and GPS showed that it blew its horn during the call and while it was near the duplex. One of Blair's friends testified that trains could be heard at the duplex.

The September 3rd call originated from a tower at 18th and Prospect. Blair's mother's apartment is directly south of this tower at 2449 Prospect. Nine test calls were made in front of Blair's mother's apartment, five originated from the cell tower at 18th and Prospect and one call reported the identical latitude and longitude as the anonymous 911 call made on September 3rd.

Blair admitted to being at both his mother's and sister's residence on September 3rd and 4th, telling police that he helped his mother move out of her apartment on 2449 Prospect and that he stayed at his sister's duplex at 1340 West Bluff. Thus, Blair was in the vicinity where the 911 calls were made.

Finally, Blair made comments very similar to the 911 caller. At trial, Cherry Chadbourne testified that Blair told her he killed his first wife because she had become a prostitute and that he was going to kill all prostitutes because they were scum of the earth. The 911 caller told the dispatcher that he killed the prostitutes because "they are scum" and "a disgrace." The trial court found this to be "stunningly identical."

The trial court's conclusion that Blair was the anonymous caller is supported by the record. That Blair was the 911 caller is important; Blair's identity as the 911 caller, in light of the facts that Blair identified the location of all six bodies and the concession at trial and oral argument that one person killed all six victims, is significant evidence supporting the sufficiency of his convictions.

**c. Sufficient evidence supports Blair's conviction for the murder of Sheliah McKenzie**

■ Blair alleges insufficient evidence to support his conviction for the first-degree murder of Sheliah McKenzie arguing that the DNA evidence on her body does not establish beyond a reasonable doubt that he killed McKenzie.

■ The elements of first-degree murder are: (1) knowingly (2) causing the death of another (3) after deliberation on the matter. *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002). Due process requires the State to prove beyond a reasonable doubt every element of a criminal offense. *In re Winship*, 397 U.S. 358, 361–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

"[A]ll the elements of a homicide case may be proved circumstantially." *State v. Morris,* 564 S.W.2d 303, 309 (Mo. App.1978). Circumstantial evidence is given the same weight as direct evidence. *Grim,* 854 S.W.2d at 405–06; *see also State v. Hutchison,* 957 S.W.2d 757, 767 (Mo. banc 1997).

McKenzie's mother told police she last saw her daughter at about 11 a.m. on September 2, 2004. McKenzie's body was found that same day. A Kansas City police officer was investigating a foul odor near 26th and Montgall. After further investigation, the officer went inside a detached garage at 2609 Montgall and found McKenzie's body under a tarp and stacked on top of the body of Patricia Wilson.

McKenzie's body was nude from the ankles to the clavicle with a dress and t-shirt bunched about her neck and shoulders. McKenzie's neck had been broken, and there was evidence she had been strangled. Officers found McKenzie's blood on the carpet inside of a house under renovation at 2617 Montgall.

A test of material taken from under McKenzie's fingernails revealed male DNA. Semen found on both of McKenzie's thighs was tested and proven to be Blair's DNA. Rectal and vaginal swabs also contained Blair's DNA. An acid phosphate test showed that Blair ejaculated into McKenzie within one day of when her body was found. When police questioned Blair, he denied ever knowing or having sex with McKenzie.

At trial, the court heard testimony that gravity will cause semen to leak from the vaginal vault and testimony that clothing rubbing against the skin would cause DNA to be sloughed off of a person's skin. Based on that testimony and the DNA evidence found on McKenzie, the court determined that McKenzie's last conscious act was intercourse with Blair.

The court noted that because of the semen on her body, "it was fair to assume" that if McKenzie's murder was not during or immediately after intercourse, she would have urinated and cleaned herself, thus partially or completely eliminating the semen. The court also determined that if McKenzie had been able to walk around after intercourse, the semen on her thighs would have been sloughed off. Instead, the court found McKenzie's body was killed in the abandoned house and that when Blair dragged her body into the garage semen "easily could have leaked out and onto her thighs in transit."

The DNA evidence, however, is not the only evidence supporting Blair's conviction for the first-degree murder of McKenzie. The court also noted Blair's denial of having ever known or having sex with McKenzie. Blair's denial evidenced a consciousness of guilt. *State v. Perry,* 275 S.W.3d 237, 249 (Mo. banc 2009) (A finder of fact may reasonably infer lying as consciousness of guilt). Considering that Blair had sex with McKenzie approximately ten days before his interview with police, his denying that he knew her or ever had sex with her is especially compelling evidence of guilt. *Compare State v. Calhoun,* 259 S.W.3d 53, 55–57 (Mo.App.2008) (The defendant's denials fourteen years later of having sex with the victim despite the presence of semen in her evidenced a consciousness of guilt).

Blair also showed a consciousness of guilt when he hid from the police after seeing himself described as a person of interest in the case. *State v. Kalagian,* 833 S.W.2d 431, 434 (Mo.App.1992) ("Evidence that a defendant avoided arrest is admissible as indicating a consciousness of guilt").

Still, there is more evidence supporting Blair's guilt. As previously established,

Blair was the anonymous 911 caller. In his September 3rd call, Blair admitted that he killed McKenzie:

[Blair]: I want to report a dead body.

[Dispatcher]: Where?

[Blair]: On 29th and Park.

[Dispatcher]: 29th and Park?

[Blair]: In the back yard at the northeast house on the corner.

[Dispatcher]: Northeast house on the corner?

[Blair]: Yeah.

[Dispatcher]: How do you [know] it's a dead body there?

[Blair]: I, I put it there.

[Dispatcher]: What's your name?

[Blair]: Oh, no. Have them look up under the branch.

[Dispatcher]: Look up under what?

[Blair]: The bushes by the alley.

[Dispatcher]: Look up under the bushes by the alley?

[Blair]: Yeah.

[Dispatcher]: How do you know the body's there?

[Blair]: Because I put the two on 25th and Montgall, and I put that there.

\* \* \*

[Dispatcher]: Who is the person?

[Blair]: I don't know her name.

[Dispatcher]: Where's [sic] you meet her at?

[Blair]: She's a prostitute.

[Dispatcher]: She was a prostitute?

[Blair]: So was the other two killed on 25th and Montgall, prostitutes.

[Dispatcher]: And you killed them, also?

[Blair]: Yeah.

■ Blair's admission is direct evidence of his guilt. *State v. Wilbon*, 874 S.W.2d 541, 542 (Mo.App.1994). Blair's admission coupled with the DNA evidence and his denial of ever knowing McKenzie also proves he murdered McKenzie because his denial, as evidence of his guilt, corroborates his confession. *State v. Miller*, 139 S.W.3d 632, 637 (Mo.App.2004) (An offense is sufficiently proven where independent evidence corroborates a defendant's confession).

**d. The court did not rely on evidence or inferences from the evidence not supported by the record to determine that Blair murdered McKenzie**

■ Blair alleges that the court relied on evidence or expert opinions not appearing in the record to support its inferences about how clothing, body functions, and personal care would have affected the semen in McKenzie's vagina and on her thighs. Specifically, Blair complains of the court's inference that semen was not affected by McKenzie's clothing and that Blair was more likely to be the last person in her presence. Blair also complains of the court's inference of how long sperm might remain inside of a woman's vagina, on her body, that it could be wiped away after urination, or the affect that gravity would have on semen inside a woman's vagina.

The responsibilities of fact finders include weighing the evidence presented, judging the credibility of evidence, and making reasonable inferences from the evidence presented. These responsibilities substantiate the rationale that an appellate court is compelled to consider evidence and all reasonable inferences in a light most favorable to the conviction when considering whether there is sufficient evidence from which a trier of fact could have reasonably found each element of a crime beyond a reasonable doubt. *State v. Gilbert*, 103 S.W.3d 743, 749 (Mo. banc 2003).

The court's inferences were based on evidence supported by the record. The

State's expert witness, the quality assurance director at the Kansas City police department's crime laboratory, testified that there is a well documented dissipation rate for semen in the vaginal cavity. The result of the acid phosphate test (a test that looks for an enzyme found in semen) will diminish in intensity as semen dissipates. This can be due to "normal dissipation from the vaginal vault itself or just decomposition of the acid phosphate enzyme as it sits in the vaginal vault."

The director also testified that movement of the body causes dissipation. Once a person stands up, "gravity takes effect, and the fluid will move according to gravity." The director testified that a pair of jeans found near Anna Ewing's body showed that Ewing had put the jeans on after intercourse with another man.

During cross-examination, the director testified that clothing rubbing against the skin would cause DNA to be sloughed off of a person's skin.

Thus, the record contains evidence that semen will dissipate from the vaginal vault after being deposited and that its presence in or on a body can be affected by gravity or clothing. This evidence refutes Blair's contention that the court relied on evidence or inferences from the evidence not supported by the record.

Blair also argues that under *Calhoun*, 259 S.W.3d at 53, the trial court, as the fact-finder, was prohibited from making inferences concerning how gravity and everyday activities affect semen.

In *Calhoun*, the State's expert witness testified that a victim was flat on her back for at least fifteen minutes after intercourse because gravity had caused semen to flow up her buttocks. *Id.* at 57–58. The defendant alleged that the court should have *sua sponte* struck the witness' testimony because the witness was in no better position than the jury to form an opinion as to the effect of gravity on semen. *Id.* at 58. This Court found it was not plain error to admit the testimony because it "is technically correct that an average person understands gravity, it is not evident or clear that an average person would be able to apply that generalized understanding to the facts of Calhoun's case and draw the conclusions that Olsson did. The circuit court did not plainly error in admitting Olsson's testimony." *Id.* at 59.

Blair argues that under *Calhoun*, the court's inferences concerning gravity and its effect on semen required expert testimony. *Calhoun* does not suggest that testimony from an expert witness is necessary before the State can prove that gravity will cause semen to run out of the vaginal vault, that clothing would wipe off a woman's upper thigh area, or that semen can be dissipated by urinating and wiping afterwards. Contained in Blair's argument is the implicit allegation that the trial court was not capable of applying expert testimony to the facts of the case and forming conclusions. Here, the court's inferences were the result of the application of testimony to the facts of the case.

### e. Sufficient evidence supports Blair's conviction for the murder of Patricia Wilson

 As detailed above, on September 2, 2004, police found the body of Sheliah McKenzie hidden under a tarp in a garage at 2609 Montgall. Patricia Wilson's body was hidden underneath McKenzie. Wilson's body was badly decomposed, and her death was ruled a homicide because her body had been concealed. Wilson's blood was found smeared on the kitchen floor in a house at 2617 Montgall (this is the same house where McKenzie's blood was found on the carpet).

Blair's identity as Wilson's murderer is established by the fact that he dumped McKenzie's body on top of Wilson's badly decomposed body. Wilson's body was concealed, and the fact that he knew where her body was and stored McKenzie's body on top of Wilson's body indicates he knew where he could hide McKenzie's body because he murdered Wilson and hid her body in the same location.

Blair also identified himself as Wilson's killer in the 911 call. After taking credit for the body at 29th and Park, Blair took credit for murdering the two bodies found on Montgall:

> [Dispatcher]: How do you know the body's there?
>
> [Blair]: Because I put the two on 25th and Montgall, and I put that there.

Blair's admission is direct evidence of his guilt. *Wilbon*, 874 S.W.2d at 542. Blair's choice to hide McKenzie on top of Wilson proves his knowledge and corroborates his conviction. *Miller*, 139 S.W.3d at 637.

Blair also showed a consciousness of guilt that he murdered Wilson when he hid from the police. *Kalagian*, 833 S.W.2d at 434.

**f. Sufficient evidence supports Blair's conviction for the murder of Anna Ewing**

On July 14, 2004, police found Anna Ewing's body at 2608 East 23rd Street, an area known for prostitution. Ewing's body was found near a raised concrete pad in the backyard and was covered by brush. Other than a bra that was still partially on her body and a knitted garment around her neck, Ewing was completely nude. Ewing's legs and feet were muddy. She had abrasions on her arm and bruises on her shoulder. She had an area of bleeding above her right eyebrow and bleeding in the white of her eye.

An amylase test for the presence of saliva was performed on Ewing's left breast. A single allele found within the DNA included Blair as a possible contributor. DNA was extracted from blood under Ewing's fingernails and test results included Ewing as a major contributor and Blair as a possible minor contributor. The DNA profile contained in the sample occurred in one in 1,400 African–Americans. Blair is an African–American.

Blair admitted to killing Ewing during the September 4th call:

> [Dispatcher]: Can you tell me if you've buried any more?
>
> [Blair]: It was one on 23rd and Prospect, they find [sic] her long time ago.
>
> [Dispatcher]: Yeah, we, we . . . The one on 23rd and Prospect, you did that one, too?
>
> [Blair]: Yeah, and I have more.

This admission by Blair supports his conviction for the first-degree murder of Ewing. *Wilbon*, 874 S.W.2d at 542. Furthermore, the DNA evidence here corroborates his admission. *Miller*, 139 S.W.3d at 637; *see also State v. Rockett*, 87 S.W.3d 398, 405 (Mo.App.2002) (holding that a jury could rely on DNA evidence that did not result in identification to a scientific certainty as substantial evidence of the defendant's identity).

Blair also showed a consciousness of guilt that he murdered Ewing when he hid from the police. *Kalagian*, 833 S.W.2d at 434.

**g. Sufficient evidence supports Blair's conviction for the murder of Darci Williams**

During the September 4th 911 call, Blair told police they would find a body at 24th and Prospect, "It's one on 24th and Prospect between 24th Street and, 24th and Terrace. It's in the alley

right next to the gate by the U–Haul place." At 7:30 p.m. on September 4, 2004, police found the body of Darci Williams lying in some brush outside a fenced parking lot. Photographs of the crime scene show two U–Haul advertising banners. The body was covered by roofing tar paper and was not immediately visible. Police officers had to cut the fence to get to the body, which was badly decomposed. A black knit shirt was around Williams' neck.

Williams' mother testified at trial that she met with her every week on Wednesday. The last time Williams' mother saw her was between 3:30 p.m. and 4 p.m. on August 25, 2004, when she dropped her off at 25th and Prospect. When Williams exited her mother's car, she crossed the street and approached three men. One of those men was Blair. Williams' mother did not hear from her on the following Wednesday and never talked to her again. Although the cause of death was undetermined, the medical examiner ruled that Williams' death was a homicide because the body was concealed at the scene.

Blair's admission concerning the location of Williams' body supports his conviction for the first-degree murder of Williams. *Wilbon*, 874 S.W.2d at 542. Blair also showed a consciousness of guilt that he murdered Williams when he hid from the police. *Kalagian*, 833 S.W.2d at 434.

**h. Sufficient evidence supports Blair's conviction for the murder of Carmen Hunt**

■ On September 4, 2004, police found the skeletal remains of Carmen Hunt behind an apartment building at 2905 Park. Her body was lying in an overgrown area and had been covered with carpet and brush. A medical examiner stated that Hunt had been dead for at least a week when she was found. Hunt's death was ruled a homicide because her body had been concealed.

During the September 3rd 911 call, Blair admitted that he killed Hunt:

[Blair]: I want to report a dead body.

[Dispatcher]: Where?

[Blair]: On 29th and Park.

[Dispatcher]: 29th and Park?

[Blair]: In the back yard at the northeast house on the corner.

[Dispatcher]: Northeast house on the corner?

[Blair]: Yeah.

[Dispatcher]: How do you [know] it's a dead body there?

[Blair]: I, I put it there.

\* \* \*

[Dispatcher]: How'd you kill the lady on, at 29th and Park? What'd you do to her?

[Blair]: Killed them (inaudible).

Blair's confession supports his conviction for the first-degree murder of Hunt. *Wilbon*, 874 S.W.2d at 542. Blair also showed a consciousness of guilt that he murdered Hunt when he hid from the police. *Kalagian*, 833 S.W.2d at 434.

**i. Sufficient evidence supports Blair's conviction for the murder of Claudette Juniel**

■ On September 4, 2004, police found the skeletal remains of Claudette Juniel in a vacant lot at 2745 Olive. Juniel's body was nude and had been covered with couch cushions, sticks, and a tire. Police testified they would not have found the body if they had not been given directions by the 911 caller. A shirt was tied around the victim's neck. Juniel's death was ruled a homicide because her body had been concealed.

During the September 4th 911 call, Blair admitted he killed Juniel:

[Blair]: I want to report two more bodies today.

\* \* \*

[Blair]: The other body is on 27th and Olive. The southeast corner house in the back yard in the yard next to the back yard which is a vacant lot.

\* \* \*

[Dispatcher]: Who are these people that you buried, sir?

[Blair]: These people are prostitutes.

[Dispatcher]: Okay, why did you kill these prostitutes?

[Blair]: Because they are scum.

[Dispatcher]: They're what?

[Blair]: Scum. They're disgrace, they're a disgrace.

Blair's confession supports his conviction for the first-degree murder of Juniel. *Wilbon*, 874 S.W.2d at 542. Blair also showed a consciousness of guilt that he murdered Juniel when he hid from the police. *Kalagian*, 833 S.W.2d at 434.

## II.

**The trial court did not err in failing to suppress Blair's statements to police on the ground that his constitutional rights were violated when the police failed to electronically record his custodial interview**

■ Blair alleges his state and federal constitutional rights were violated when the State failed to electronically record his interrogation, even though it had the means, and when the State failed to preserve an electronic record of his interrogation recorded by a local television station. There is no constitutional requirement that law enforcement electronically document custodial interrogations.

**a. The record of Blair's interrogation**

After his arrest, Blair waived his *Miranda* rights and agreed to talk to the police. Blair was interrogated for approximately seven hours. The room in which Blair was interrogated contained a video camera and recording equipment. The interrogation was later moved to a room where recording was not possible. Both rooms, however, were equipped with cameras to enable monitoring in another room through a closed circuit television.

Blair's interrogation was not independently recorded by police, but the police allowed a camera crew from a television show to record Blair's interrogation. Police never received a copy of the recording, and the recording was not preserved by the production company. The only footage that survived was that included in the television show. Consequently, the entirety of the footage was never made available to defense counsel.

Blair filed a pretrial motion to suppress his statement to police alleging that his statements to police were unreliable because, among many reasons, the police failed to electronically record his interview, though they had the ability to do so. While arguing the motion, Blair's counsel claimed that police must record a defendant's statement when possible. The court overruled the motion to suppress. Blair also objected to the admission of evidence of his statements at trial.

**b. Standard of Review**

■ In reviewing a trial court's ruling on a motion to suppress, there must be "substantial evidence" to support the ruling. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). "[T]he facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001).

 In "reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses." *Rousan*, 961 S.W.2d at 845. This Court gives deference to the trial court's factual findings but reviews questions of law *de novo*. *Id.*

### c. There is no constitutional requirement to electronically record a defendant's custodial interview

The issue of whether law enforcement is constitutionally required to record an interrogation is one of first impression in Missouri. Blair argues that the police department's failure to preserve the recording of his interrogation renders his confession involuntary and violates his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and article I, sections 10 and 18(a) of the Missouri Constitution. As a result, Blair asks this Court to impose a rule that would require electronic recording of custodial interrogations. The United States Supreme Court has never held that the failure of police to record a defendant's police interrogation renders the statement involuntary or violates any provision of the United States Constitution.

To support his contention, Blair relies on cases adjudicated in Alaska and Minnesota. In *Stephan v. State*, 711 P.2d 1156, 1158 (Alaska 1985), the Alaska Supreme Court determined "that an unexcused failure to electronically record a custodial interrogation conducted in a place of deten-tion" violates a suspect's due process rights under Alaska's constitutional provision paralleling the Fifth Amendment. Similarly, the Minnesota Supreme Court legislated such a requirement when it determined that under its "supervisory powers" it was imposing a recording requirement for all custodial interrogations. *State v. Scales*, 518 N.W.2d 587, 589 (Minn. 1994). *Scales*, however, expressly refused to find that the failure to record a custodial interrogation amounted to a due process violation of Minnesota's constitutional provision paralleling the Fifth Amendment.

Blair is correct that certain public policy considerations support the rationale of the rule he requests. As noted by the Supreme Court of Tennessee in *State v. Godsey*, 60 S.W.3d 759, 772 (Tenn.2001), recording interrogations would alleviate many of the problems that surround criminal interrogations:

> There can be little doubt that electronically recording custodial interrogations would reduce the amount of time spent in court resolving disputes over what occurred during the interrogation. As a result, the judiciary would be relieved of much of the burden of resolving these disputes. In light of the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice.

 A majority of state courts that have considered this issue have refused to find that a defendant's constitutional rights were violated when the police fail to record an interrogation or to create an exclusionary rule suppressing these statements when they are not recorded.[1] *See People*

---

1. It is not for this Court to say that Alaska erred in finding such a requirement in its own constitution. Under *Minnesota v. National Tea Co.*, 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940), the United States Supreme Court observed that a state can apply stricter

*v. Holt,* 15 Cal.4th 619, 63 Cal.Rptr.2d 782, 937 P.2d 213, 241–42 (1997); *Starks v. State,* 594 So.2d 187, 196 (Ala.App.1991); *People v. Raibon,* 843 P.2d 46, 48–49 (Colo. App.1992); *State v. James,* 237 Conn. 390, 678 A.2d 1338, 1357–58 (1996); *Coleman v. State,* 189 Ga.App. 366, 375 S.E.2d 663, 664 (1988); *State v. Kekona,* 77 Hawai'i 403, 886 P.2d 740, 745–46 (1994); *State v. Rhoades,* 119 Idaho 594, 809 P.2d 455, 461–62 (1991); *Stoker v. State,* 692 N.E.2d 1386, 1390 (Ind.App.1998); *State v. Morgan,* 559 N.W.2d 603, 609 (Iowa 1997); *State v. Speed,* 265 Kan. 26, 961 P.2d 13, 24 (1998); *Brashars v. Commonwealth,* 25 S.W.3d 58, 61–62 (Ky.2000); *State v. Thibodeaux,* 750 So.2d 916, 923–24 (La.1999); *State v. Buzzell,* 617 A.2d 1016, 1018–19 (Me.1992); *Commonwealth v. Fryar,* 414 Mass. 732, 610 N.E.2d 903, 909 n. 8 (1993); *People v. Fike,* 228 Mich.App. 178, 577 N.W.2d 903, 906 (1998); *Williams v. State,* 522 So.2d 201, 208 (Miss.1988); *Jimenez v. State,* 105 Nev. 337, 775 P.2d 694, 696–97 (1989); *State v. Thibodeaux,* 341 N.C. 53, 459 S.E.2d 501, 507 (1995); *State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 686 (1997); *Commonwealth v. Craft,* 447 Pa.Super. 371, 669 A.2d 394 (1995); *Godsey,* 60 S.W.3d at 771–72; *State v. James,* 858 P.2d 1012, 1017–18 (Utah App.1993); *State v. Gorton,* 149 Vt. 602, 548 A.2d 419, 421–22 (1988); *State v. Spurgeon,* 63 Wash.App. 503, 820 P.2d 960, 961–64 (1991); *State v. Kilmer,* 190 W.Va. 617, 439 S.E.2d 881, 892–93 (1993); *Gale v. State,* 792 P.2d 570, 588 (Wyo.1990).

There is nothing in the text of the Missouri Constitution that requires recording custodial interrogations. The United States Supreme Court has not held that the United States Constitution imposes this requirement. Our Supreme Court of Missouri generally looks to United States Supreme Court precedent for interpreting mirror provisions of our state constitution. *E.g., Bernat v. State,* 194 S.W.3d 863, 867 (Mo. banc 2006). This Court determines that no provision of the Missouri or the United States Constitution required the recording of Blair's interrogation.

The Supreme Court of Tennessee correctly held in *Godsey* whether to mandate the recordings of custodial interrogations is a matter of public policy and that "[t]he determination of public policy is primarily a function of the legislature." 60 S.W.3d at 772 (internal quotations and citations omitted). The Missouri legislature has recently enacted such a rule effective August 28, 2009. CCS SS SCS HCS HB No. 62. HB62 contains § 590.701, which requires the recording of all custodial interrogations of persons suspected of committing to attempt or committing specific violent crimes. Nevertheless, this new statute would not provide future defendants with the relief sought by Blair. Under the new law, failure to record the interrogation results in the loss of funding to the offending police agency. Section 590.701.6 specifically states, "Nothing in this section shall be construed as a ground to exclude evidence."

The judgment is affirmed.

All concur.

standards by interpretation of its own constitution when examining passages in the state constitution that mirror that of the federal constitution. There is no doubt, however, that the United States Supreme Court is the final arbiter of the minimum requirements found in the federal constitution.