**STATE of Missouri, Respondent,**

v.

**Craig D. JONES, Appellant.**

**Nos. WD 50668, WD 53147.**

Missouri Court of Appeals,
Western District.

Oct. 28, 1997.

---

4. We make no statement on Elyria's claim of

forum non conveniens.

6

Rebecca L. Kurz, Assistant Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Fernando Bermudez, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

HOWARD, Judge.

Craig Jones appeals from convictions of two counts of murder in the first degree, § 565.020.1, RSMo 1994, and two counts of armed criminal action, § 571.015, RSMo 1994, claiming that there was insufficient evidence to support the murder convictions. He also appeals from the denial of his Rule 29.15 motion for post-conviction relief, claiming that his trial counsel was ineffective for failing to adequately investigate a potential defense witness, and for failing to adequately investigate a State's witness who lied when he denied, at trial, that he was testifying pursuant to a plea agreement with the federal government. Jones also contends that the State failed in its duty to discover and disclose to the defense that the State's witness had made a deal with the federal government to testify against him.

Mr. Jones' convictions are affirmed on direct appeal, but the judgment denying his post-conviction motion is reversed, the convictions and sentences are vacated, and the cause is remanded for a new trial.

Shortly after 2:00 a.m. on January 30, 1994, Eric and Omar Williams were shot and killed as they stood in the parking lot of Club 95 on Hickman Mills Drive in Kansas City, Missouri. Jones was subsequently arrested and charged with the murders. In November of 1994, shortly before Jones' trial, Jeff Stigall, the prosecutor, was discussing the murders with another lawyer, John O'Connor, who happened to represent a man named Jeffrey Hudspeth in connection with some unrelated federal charges stemming from a number of bank robberies. O'Connor informed Stigall that Hudspeth claimed to have witnessed the murders and had informed federal authorities of that claim.

Stigall made no inquiries as to whether Hudspeth had made any deals or plea bargains with the U.S. attorney's office. In fact, on March 8, 1994, Hudspeth had entered into a plea agreement with David Newbert, an assistant U.S. attorney. That agreement, which was filed with the U.S. District Court for the Western District of Missouri, stated that Hudspeth would assist in the prosecution of those responsible for the murders of the Wilson brothers, and that, in return, the

U.S. attorney would refrain from prosecuting Hudspeth for additional bank robberies and recommend a sentence reduction.

Stigall did not offer Hudspeth a deal for testifying at Jones' trial on the murder charges, as he believed that any deal would damage Hudspeth's credibility as a witness. However, Stigall did ask a detective to interview Hudspeth. The resulting videotaped statement, taken on November 14, 1994, was accompanied by a two-page narrative summary of the statement prepared by the detective. Stigall then sent a transcript of Hudspeth's statement and a copy of the detective's summary to George Wheeler, who was Mr. Jones' trial counsel in the case at bar.

Wheeler deposed Hudspeth on December 1, 1994, four days before Jones' trial. At the deposition, Hudspeth stated that he had talked to both Newbert and O'Connor about the Wilson murders, but Hudspeth did not acknowledge that he had entered into a plea agreement. Wheeler suspected that Hudspeth had received a deal to testify against Jones, but did not conduct any further investigation into the matter.

At Jones' trial, Hudspeth testified about the shootings outside of Club 95. Hudspeth stated that Jones drove past the parking lot holding a rifle out the car window. When Hudspeth saw the rifle, he started running and heard gunshots. Hudspeth admitted that he was in federal custody for a bank robbery conviction, and that he had also been convicted of an attempted rape two years earlier. However, Hudspeth denied that any state or federal authority offered him any kind of deal for testifying at Jones' trial.

Another witness, Anthony Canady, also linked Jones to the shootings. Canady testified that, when the club closed at around 2:00 a.m., he left the building with Eric Wilson and two other companions, Telle Benton and Roland Wayne. Omar Wilson was waiting outside the door to the club, and informed Eric that he had had a confrontation with Jones earlier in the evening. Then, as the group stood by their cars in the parking lot, Jones drove past with his window down. Eric gestured to Jones by raising his hands in the air, and Canady explained that the gesture was to indicate that he was unarmed. Jones called out "What's up?," and Canady saw an assault rifle sticking out of the car's open window. Shots were fired, and Canady ducked behind a car until the ensuing gunfire ended, and then saw the Wilson brothers lying on the ground. Canady admitted that the State had agreed to dismiss a pending weapons charge against him if he testified in the case at bar, and that he would not have testified if the State had refused to dismiss the charge. Canady further acknowledged that he was on parole after serving two years of a six-year sentence for conspiracy to distribute cocaine, and that, shortly after the shootings, he had told the police that he did not observe any vehicles on the street and that he did not know where the gunfire had come from.

A police crime scene technician also testified at Jones' trial, and stated that four shell casings marked "PMC 30 Carbine" were found in the middle of Hickman Mills Drive, and that eight shell casings marked "PMC 32 Auto" were found in the parking lot near Eric Wilson's body. The .32 caliber shell casings were fired from an automatic handgun recovered from Telle Benton. The .30 caliber shell casings were fired by an unrecovered weapon, and a ballistics expert testified that that particular type of bullet was primarily fired out of rifles. In addition, there were some shot pellets found at the scene, suggesting that three separate weapons were fired by various parties in the incident. The parties stipulated that the victims died as a result of gunshot wounds, but there was no evidence as to which type of ammunition caused the victims' wounds.

Jones testified in his own defense at trial, and denied killing the Wilson brothers. He stated that he spent the night of the murders with his girlfriend, LaTonya Sykes, at her mother's home. In addition, both LaTonya Sykes and her mother, Evelyn Sykes, testified that Jones stayed at Evelyn Sykes' home that night. LaTonya Sykes further testified that there was bad blood between Jones and the Wilson brothers after an earlier incident in which Eric Wilson beat up Jones in a club.

Following the trial, a jury found Jones guilty of two counts of first-degree murder and two counts of armed criminal action. He was sentenced to two terms of life imprisonment without parole and two terms of ten-year imprisonment, respectively, with all the sentences to run consecutively. Jones then appealed his convictions and filed a Rule 29.15 motion for post-conviction relief. The Rule 29.15 motion included claims that Jones' trial counsel was ineffective for failing to investigate a potential defense witness named Terrance Davis, and for failing to adequately investigate Hudspeth and thus failing to discover that Hudspeth had made a deal with the federal government to testify against him.

At Jones' Rule 29.15 hearing, he produced a copy of Hudspeth's plea agreement, which showed that it was filed on March 8, 1994, with the U.S. District Court for the Western District of Missouri in the case of *United States of America v. Jeffrey Hudspeth.* Jones' trial counsel, George Wheeler, testified that, at the time of trial, he was not aware that the plea agreement existed. Wheeler was asked if he suspected that such a deal existed, and the following exchange occurred:

A. Yes, I did at that time, and I do suspect that somewhere along the line a deal was made, but there was no way for me to find out, neither was there any way for me to find out, neither was there any way for me to prove that there was a deal. We asked him on numerous occasions, and we asked the State, and we tried to produce evidence that a deal was made. It became kind of ironic that one week prior to the time that we were scheduled to go to trial the State didn't have a case at all and all of a sudden they were able to produce two witnesses, one of these being a witness out of Colorado who said he had some knowledge of this case when there was no evidence that we had before that that was the case.

Q. Did you ever call Mr. Hudspeth's attorney, John O'Connor, to ask him whether he knew if Hudspeth had made a deal to testify against Craig Jones?

A. I don't recall talking to John O'Connor concerning any deals being made.

Q. Did you ever call or attempt to contact the assistant United States prosecuting attorney Dave Newbert to ask him if a deal had been made with Hudspeth to testify against Craig Jones?

A. No, I did not call the U.S. Attorney's Office.

Q. Did you ever go to the federal courthouse here in Kansas City, the one on 811 Grand Street, to review the court file on Hudspeth's federal robbery case?

A. No, I did not.

Q. Did you ever have an investigator, paralegal, or anyone connected with your office go to the federal courthouse and look at the file on Hudspeth's robbery case?

A. No, I did not.

Q. Other than the deposition that you conducted of Hudspeth, did you do any additional investigation into his background?

A. No, I did not.

Wheeler also testified that, if he had known of the plea agreement, he would have used it to impeach Hudspeth at trial.

At the hearing, Jones also offered the deposition testimony of Terrance Davis, who was a co-defendant of Hudspeth in the federal bank robbery prosecutions. Davis testified that, at approximately 11:30 p.m. on the night of the shootings, he had gone to Club 95 with Hudspeth and another man named Troy Taylor, but the three had left after about ten or fifteen minutes because the line to get in was too long. Instead, according to Davis, the three went to a Shoney's restaurant on Wornall Road, where they stayed until Taylor was paged by a friend of his who said there had been shootings at the club. Davis maintained that Hudspeth could not have witnessed the shootings because Hudspeth was with him at Shoney's at the time. Davis further stated he would have been willing to so testify at Jones' trial, but he was never contacted by the defense.

Wheeler, in his hearing testimony, acknowledged that, prior to trial, he had learned from the police report of Hudspeth's videotaped interview that Hudspeth had

claimed to be with Davis and Taylor on the night of the shootings, and that he had tried to locate Davis by conducting a "normal investigation," which Wheeler described by explaining that he "asked around, used the phone book, or used general knowledge or general information." Wheeler further explained that it was not until after the trial that he found out that Davis' testimony might be "significant" in the sense that it contradicted Hudspeth's account.

After the hearing, the motion court overruled Jones' post-conviction claims for relief. The motion court made the following findings with respect to Hudspeth's plea agreement:

> An examination of counsel's cross-examination of Hudspeth shows a spirited and strong attack upon Hudspeth's credibility. Counsel strongly argued that the just before trial discovery and identification of Hudspeth as a witness to the crime was not credible. He argued that Hudspeth's recent appearance as a witness indicated his lack of credibility and motivation to lie in exchange for perhaps some hoped for leniency regarding his federal sentence if not agreed upon leniency. If Wheeler had known of the federal plea agreement, he would have been presented with a difficult strategic choice. He might have impeached Hudspeth with the plea agreement. To do so, however, would have *supported* Hudspeth's testimony that he told federal authorities of his knowledge about the crime only a few weeks after it occurred and many months before the State learned of his knowledge and disclosed him as a witness. Strategic choices made after thorough investigation are virtually unchallengeable. The court does not believe in the face of Hudspeth's and the State's denial of any plea agreement that counsel conducted a less than thorough investigation by not double checking their statements with Hudspeth's lawyer, the U.S. attorney, or studying the federal court file. Reasonable professional judgment would also have supported the cross-examination strategy undertaken by Wheeler even if he had proof of the federal plea agreement. (Emphasis in original.)

The motion court also determined that Jones was not entitled to post-conviction relief on his claim involving the investigation of Davis. The motion court found that Wheeler was unaware that Davis could potentially impeach Hudspeth's testimony until after the trial, and concluded that "the testimony of Terrance Davis provides no viable defense, but merely impeaches one of the State's witnesses."

In his first point on appeal from the denial of his Rule 29.15 motion, Jones claims that his trial counsel was ineffective for failing to adequately investigate Jeffrey Hudspeth and thus failing to discover that Hudspeth had made a deal with the federal government to testify against him. Jones argues that if his trial counsel had learned of the plea agreement, he could have shown the jury that Hudspeth lied under oath and that Hudspeth had a motive to testify against him.

In reviewing the denial of a Rule 29.15 motion, this court is limited to a determination of whether the findings, conclusions, and judgment of the motion court are clearly erroneous. *State v. Starks*, 856 S.W.2d 334, 336 (Mo. banc 1993). To prevail on a claim of ineffective assistance of counsel, Mr. Jones must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Id.* To prove deficient performance, a movant must show that counsel's acts or omissions were outside the range of professionally competent assistance. *Id.* In order to show prejudice, a movant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Counsel has a duty to make reasonable professional investigations or to make a reasonable decision that makes particular investigations unnecessary. *Moore v. State*, 827 S.W.2d 213, 215 (Mo. banc 1992). Wheeler failed to meet this standard when he did not seek information from O'Connor, federal court records, or federal authorities to determine if Hudspeth had made a deal with the federal government to testify against Jones. In so holding, we do not decide

whether, under the circumstances, an attorney *should* have suspected that there was a plea agreement. The fact is that Wheeler knew that Hudspeth had spoken to the assistant United States attorney and to O'Connor about the Wilson murders, and he acknowledged that he did suspect a plea agreement had been made. Yet, he made insufficient efforts to see if such a plea agreement existed. In this case, counsel's failure to pursue this readily available evidence falls outside the range of reasonably competent behavior under the circumstances. *Moore*, 827 S.W.2d at 215.

■ We also conclude that this deficient performance prejudiced Jones' defense. Hudspeth was a key witness, as Canady was the only other person who claimed to have witnessed the shootings. In order to convict Jones, the jury had to believe either Canady or Hudspeth, and Canady's testimony was compromised by the fact that he had acknowledged in front of the jury that he had received a deal to testify against Jones, and admitted that he would not have testified without such a deal. As a result of Wheeler's failure to pursue readily available evidence regarding Hudspeth's own plea agreement, the jury did not learn of Hudspeth's similar motives to testify, or that Hudspeth had lied about receiving a deal. This failure raises "a probability sufficient to undermine confidence in the outcome." *Starks*, 856 S.W.2d at 336.

In its findings, the motion court determined that, if Wheeler had discovered the plea agreement, he would have faced a difficult strategic choice, since a decision to impeach Hudspeth with the agreement would have undercut the approach that Wheeler did take to impeach Hudspeth, which was to try to show that Hudspeth was not credible because he delayed in coming forward with his information about the shootings. But in this case, we are not faced with a matter of Wheeler making a strategic choice between two courses of action—Wheeler's failure to pursue readily available evidence of the plea agreement denied him this choice. And it is clear that evidence of the plea agreement would have provided stronger grounds for impeachment. At the Rule 29.15 hearing,

Wheeler acknowledged that, if he had known of the plea agreement, he would have used it to impeach Hudspeth at trial. Furthermore, in his closing argument to the jury, Wheeler attacked Hudspeth's credibility by suggesting that Hudspeth must have made a deal rather than by arguing that Hudspeth merely delayed in coming forward.

Our decision to grant relief on Jones' claim of ineffective assistance of counsel is consistent with other cases on similar facts. In *Bonner v. State*, 765 S.W.2d 286 (Mo.App. W.D.1988), this court held that an attorney who was told by his client before trial that a State's witness had a prior criminal conviction was ineffective for failing to obtain evidence of that conviction for impeachment purposes at trial. In *State v. Delgado*, 194 Wis.2d 737, 535 N.W.2d 450 (1995), as in the case at bar, the attorney failed to pursue readily available evidence that would have shown that a State's witness had been promised substantial consideration in exchange for his testimony and that he had lied about whether he had been promised anything. The Wisconsin Court of Appeals held that the attorney's failure constituted deficient performance, and that the deficiency was sufficiently prejudicial to require a new trial.

In his second and third points on appeal from the denial of his Rule 29.15 motion, Jones claims (1) that his trial counsel was ineffective for failing to investigate Terrance Davis, who he asserts could have provided a viable defense by establishing that Hudspeth could not have been a witness to the shootings, and (2) that Jeff Stigall, the State prosecutor, failed in his duty to discover and disclose to the defense that Hudspeth had made a deal with the federal government to testify against him. However, we need not address these claims because of our disposition of Jones' first point on appeal

■ In his sole point on direct appeal, Jones claims that there was insufficient evidence to support his convictions of first-degree murder. Specifically, Jones contends that the State failed to establish the element of deliberation, or that he caused the death of the Wilson brothers.

 In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the State, and we disregard all evidence and inferences to the contrary. *State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995). Review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

 In order to make a submissible case of first-degree murder, the State is required to establish, beyond a reasonable doubt, that the defendant "knowingly cause[d] the death of another person after deliberation upon the matter." *State v. Watson,* 839 S.W.2d 611, 616 (Mo.App. E.D.1992); § 565.020.1. In this context, deliberation is defined as "cool reflection for any length of time no matter how brief." *State v. Feltrop,* 803 S.W.2d 1, 11 (Mo. banc 1991); § 565.002(3).

 The deliberation necessary to support a conviction of first-degree murder need only be momentary; it is only necessary that the evidence show that the defendant considered taking another's life in a deliberate state of mind. *State v. Clark,* 913 S.W.2d 399, 404 (Mo.App. W.D.1996). A deliberate act is a free act of the will done in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of violent passion suddenly aroused by some provocation. *Id.* Deliberation may be inferred from the circumstances surrounding the murder. *Id.*

In this case, there was sufficient evidence to establish that Jones shot the Wilson brothers because of a continuing grudge fueled by prior confrontations rather than because of violent passion suddenly aroused by some provocation. Consequently, there was sufficient evidence of the deliberation necessary to support convictions of first-degree murder.

Jones also contends that, given the various types of spent ammunition found at the scene, the State failed to establish that it was the bullets which he fired that killed the victims. However, the jury could have reasonably inferred from the evidence that Jones fired at the Wilsons while Benton, a friend of the Wilsons', fired at Jones' vehicle in the street. Point denied.

Mr. Jones' convictions are affirmed on direct appeal, but the judgment denying his post-conviction motion is reversed, the convictions and sentences are vacated, and the cause is remanded for a new trial.

All concur.