STATE of Missouri, Respondent,

v.

Vincent Keith MINNER, Appellant.

No. WD 70338.

Missouri Court of Appeals,
Western District.

March 9, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2010.

Application for Transfer Denied
June 29, 2010.

Kent Denzel, Columbia, MO, for appellant.

Shaun J. Mackelprang and Daniel N. McPherson, Jefferson City, MO, for respondent.

Before Division Four: THOMAS H. NEWTON, Chief Judge, RUSSELL E. STEELE, Special Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Vincent Minner appeals from a judgment of conviction entered following a jury verdict. Minner was convicted of first degree murder, first degree assault, first degree burglary, and two counts of armed criminal action. On appeal, Minner claims the trial court erred in permitting an officer to testify to statements made at the scene of the crime by the murder victim, which implicated Minner, as a dying declaration. Minner also claims the jury could not have found beyond a reasonable doubt that the murder victim died as a result of the gunshot wounds inflicted by Minner or that Minner acted with deliberation. Finally, Minner alleges the trial court committed plain error in failing to intercede when the State in closing argument characterized a statement made by Minner's counsel during closing argument as deception. We affirm.

## Factual and Procedural History[1]

During the overnight hours of December 4–5, 2006, Michael Terry ("Terry") and Jennifer Terry ("Jennifer"), then husband and wife,[2] were at home, sleeping, in their apartment in Sikeston, Missouri.[3] Jennifer was in the bedroom. Terry was in the living room, because he was suffering from pain following a recent hospitalization.[4] Jennifer was awakened by a knock on the door. She looked out her bedroom window. She saw Minner and another man at the door. Jennifer heard Terry ask who was at the door. Jennifer heard Minner respond, "It's V." Jennifer knew this to be a nickname used by Minner. Jennifer heard a gunshot followed immediately by an exclamation from Terry consistent with having been shot.

Jennifer then heard the sound of the front door being kicked in. She opened her bedroom door and saw Minner in the apartment. There was no sign of the second man she had seen when she first looked out her bedroom window. Terry screamed at Jennifer to get back into the bedroom. Jennifer closed and locked the bedroom door. She picked up the phone to dial 911, but the phone was not working. Jennifer called 911 from her cell phone.

Jennifer heard Minner ask Terry, "Where's the bitch at?" Terry asked Minner why he was doing this, to which Minner responded he was doing it for Brandon Johnson, Orlando Sheron, Travis Williams, and others.[5] Jennifer heard sounds of a struggle and then two or three gunshots.

---

1. We view the facts in the light most favorable to the jury's verdict. *State v. O'Brien*, 857 S.W.2d 212, 215–16 (Mo. banc 1993).

2. By the time of trial, Jennifer Terry had remarried and had taken the name Jennifer Anderson. To avoid confusion, we refer to Jennifer by her first name.

3. On Minner's motion for change of judge and for change of venue, this case was transferred to the Circuit Court of Boone County.

4. Terry had been recently released from the hospital following liver surgery, where a cancerous piece of his liver had been removed.

5. Jennifer had been working as an informant with the Sikeston police department since the fall of 2005 making controlled drug buys. Jennifer had made controlled buys from Travis Williams and Orlando Sheron. Jennifer had never made controlled buys from Minner. Jennifer was scheduled to testify against Travis Williams on December 11, 2006. Though

Minner then kicked in the bedroom door. Minner punched Jennifer and stabbed her in the neck with a knife.

Minner headed towards Jennifer's grandmother's room. Jennifer was afraid for her grandmother's safety. She left the bedroom and saw Minner and Terry fighting in the kitchen. Jennifer picked up a knife lying on the floor and began stabbing Minner. As the three struggled, Minner attempted to pick up the gun which had also fallen to the floor. Jennifer grabbed the gun and put it up in a kitchen drawer. By this time, the struggle between Minner and Terry had taken its toll. Spent and seriously injured, both men lay in different locations in the apartment. Jennifer sat on top of Minner to prevent him from leaving. Minner said to Terry, "Just die with me, man. Just die with me."

When officers arrived at the scene, they found Jennifer bloody, disheveled, and disoriented. The apartment was in complete disarray. Blood spatter and broken glass and furniture were found throughout the apartment. Terry was kneeling on the living room floor. Minner was lying on his back in front of the refrigerator. Both men were bleeding heavily. EMTs arrived. Jennifer was placed in an ambulance and was being treated for a laceration to her neck. Jennifer told officers on the scene that Minner shot Terry through the apartment door.

EMTs on the scene initially treated Terry where he lay in the apartment. Captain James Hailey ("Hailey") then spoke with Terry. Hailey testified that Terry had gunshot wounds to his chest and head and that Terry was weak, ashen, and lying in blood. After conferring with a supervising officer, Hailey told Terry that it looked like he was dying and asked Terry who had shot him. Terry responded that the medics had told him that he was dying and that he knew that he was dying. Hailey again asked Terry who had shot him. Terry indicated to Minner.

During their investigation, officers observed a bullet hole in the front door of the apartment with a burn pattern and stippling on the door. The bullet had gone all the way through the door. The officers also observed damage to the door indicating the door had been forced open. Several live .45–caliber rounds and spent .45–caliber shell casings were found in the apartment. The gun Jennifer had placed in the kitchen drawer was a .45–caliber semiautomatic handgun. Ballistics tests confirmed the gun found in the kitchen could have fired the bullets that were recovered.

Terry was transported to the hospital. Two bullets were recovered from Terry after he underwent surgery, one from his chest and the other from his back. Though Terry initially showed signs of recovery, his condition soon thereafter deteriorated. Terry died on January 2, 2007. Dr. Deidiker performed an autopsy. The autopsy revealed three healing gunshot wounds. One gunshot wound was to the right shoulder. One shot grazed Terry's skull. One shot lacerated a section of Terry's liver, pierced his diaphragm and ended up in his abdominal wall. The autopsy also revealed that Terry had a very cirrhotic liver and signs of heart failure— such as an enlarged heart, lungs that were congested by a buildup of fluids, and congestion of the spleen and adrenal glands. Dr. Deidiker testified that, to a reasonable degree of medical certainty, the primary

it is unclear Minner's relationship with Travis Williams, Minner had previously approached Terry on several occasions to persuade Terry to convince Jennifer not to testify against Williams. On one such occasion, Minner had offered to pay Jennifer $1,000 in exchange for her refusal to testify.

cause of Terry's death was multiple organ failure as a complication of multiple gunshot wounds. Though Dr. Deidiker testified that Terry was already in poor health due to having cirrhosis of the liver and liver cancer, Dr. Deidiker opined that the gunshot wounds created an additional stress on Terry's body that Terry could not withstand.

Following a jury trial, Minner was convicted on Count I—Murder First Degree under section 565.020,[6] on Count II—Assault First Degree under section 565.050, on Count IV—Burglary First Degree under section 569.160, and on Counts VI and VII—Armed Criminal Action under section 571.015. Minner was acquitted on Count II—Assault First Degree, on Count V—Tampering with a Victim/Witness, and on Count VIII—Armed Criminal Action.[7] Minner was determined to be a prior offender. Minner was sentenced to life imprisonment without possibility of probation or parole on Count I. He was sentenced to ten years on each of Counts II, IV, VI, and VII, with his sentences on Counts II and IV to run concurrent with the sentence on Count I, and with his sentences on Counts VI and VII to run concurrent with each other but consecutive to the sentence on Count I. This appeal follows.

### Point One

In his first point on appeal, Minner contends that the trial court erred in admitting, over Minner's objection, the hearsay testimony of Hailey relaying the statement made by Terry, which implicated Minner as his assailant. Minner's point relied on actually raises two separate arguments. First, Minner contends that Terry's statement did not qualify as a dying declaration because the totality of the circumstances

did not objectively demonstrate that Terry's death was imminent. Second, Minner contends that Terry's statement was testimonial hearsay deemed inadmissible in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), because a defendant has the right to confront his accuser pursuant to the Confrontation Clause.

During trial, Minner's counsel objected to Hailey's testimony regarding a statement made to him by Terry "based on a previous motion." The previous motion was a motion in limine that the court had just reviewed and had before it. In order to preserve an objection for appellate review based on a motion in limine, it is necessary to object at trial when the relevant evidence is being presented, because a "motion in limine, in and of itself, preserves nothing for appeal." *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). Although, Terry's counsel did timely object at trial when Hailey was asked about Terry's dying declaration, trial counsel did not specifically state the basis for the objection but, instead, cross referenced the motion in limine. The motion in limine argued that Terry's statement was inadmissible hearsay. The specific basis for the hearsay objection raised in the motion in limine was a lack of foundation to warrant treating Terry's statement as a dying declaration. We conclude that Minner's objection at trial preserved this issue, which is the first argument asserted by Minner in his first point on appeal, for appellate review. As to this claim of error, we will afford the trial court broad discretion in assessing the admissibility of evidence, and we will not interfere with the trial court's determination absent a clear abuse of discretion.

---

**6.** All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

**7.** These charges primarily related to allegations that Minner had pointed a gun to Jennifer's head that misfired.

*State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006).

 Although we find that Minner's objection preserved the hearsay objection based on a lack of foundation to support a dying declaration, we conclude the objection did not preserve the alleged constitutional claim for our review. "A hearsay objection does not preserve constitutional claims relating to the same testimony." *State v. Chambers,* 891 S.W.2d 93, 104 (Mo. banc 1994) (citations omitted). "To preserve appellate review, constitutional claims must be made at the first opportunity, with citations to specific constitutional sections." *Id.* at 103–04 (quoting *State v. Parker,* 886 S.W.2d 908, 925 (Mo. banc 1994)). The motion in limine failed to address the second argument raised by Minner in his first point on appeal—the constitutional impermissibility of admitting Terry's statement, even if properly determined to be a dying declaration, because of the protections afforded Minner by the Confrontation Clause. Although the motion in limine mentioned the Confrontation Clause, the motion mistakenly cited *Crawford* for the proposition that "absent some exception to the rule against hearsay, the admission of such is improper." This is not what *Crawford* holds. *Crawford* holds that testimonial hearsay (a subsection of all evidence that is hearsay), ***even if*** qualified as an exception to the hearsay rule, cannot be admitted in a criminal case, as a general rule, because of the Confrontation Clause. *Crawford,* 541 U.S. at 68–69, 124 S.Ct. 1354. The Confrontation Clause provides that "[i]n all criminal prosecutions the accused shall enjoy the right ... to be confronted with witnesses against him." U.S. Const. amend. VI. Minner's hearsay objection was limited to the argument that Terry's statement *did not qualify* as an exception to the hearsay rule and, thus, should not have been admitted. Minner never argued that Terry's statement, *even if qualified* as an exception to the hearsay rule, should not have been admitted because to do so would violate Minner's rights under the Confrontation Clause. Minner is not permitted to " 'broaden the objection he presented to the trial court; [and] he cannot [on appeal] rely' " on this new theory. *State v. Clark,* 280 S.W.3d 625, 628 (Mo.App. W.D.2008) (quoting *State v. Phillips,* 939 S.W.2d 502, 505 (Mo. App. W.D.1997)). Minner's claim that admission of Terry's statement to Hailey violated his rights under the Confrontation Clause has not been preserved.

Had Minner's claim been properly preserved, we would have reviewed the trial court's admission of Terry's dying declaration *de novo. State v. Nabors,* 267 S.W.3d 789, 793 (Mo.App. E.D.2008). However, as Minner's claim has not been preserved, our review is for plain error. Review of plain error involves a two-step process:

> First, we must determine if the claim on its face establishes substantial grounds to find that manifest injustice or miscarriage of justice has resulted. Not all prejudicial error can be deemed plain error. Plain error is evident, obvious, and clear error. If plain error is evident on the face of the claim, then we may proceed to consider whether or not a miscarriage of justice or manifest injustice will occur if left uncorrected. Where no plain error appears on the face of the claim, we should decline to exercise our discretion to review the claim.

*State v. Nibarger,* 304 S.W.3d 199, 201 (Mo.App. W.D.2009) (internal citations omitted) (quotation marks omitted).

## Analysis

### *Dying Declaration*

 We will first address Minner's contention that the trial court abused its

discretion by permitting admission, as a dying declaration, of Hailey's testimony regarding Terry's statement implicating Minner. "Our review of the trial court's decision to admit hearsay testimony ... is limited to a determination of whether such admission amounted to an abuse of discretion." *State v. Costa,* 11 S.W.3d 670, 678 (Mo.App. W.D.1999). A trial court abuses its discretion when its ruling is " 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *Id.* at 678–79 (quoting *Anglim v. Mo. Pac. R.R. Co.,* 832 S.W.2d 298, 303 (Mo. banc 1992)). "The evidence is viewed in the light most favorable to the result of the trial court." *Id.* at 679.

▇▇▇ Hearsay is an out of court statement offered to prove the truth of the matter for which it is asserted. *State v. Wallingford,* 43 S.W.3d 852, 854 (Mo.App. W.D.2001). One exception to the hearsay rule is the dying declaration. "In order for hearsay testimony to be admissible under that exception, the State is required to demonstrate that the hearsay statements were made while the *declarant believed* that his or her death was imminent and that there was no hope of recovery." *State v. Hayes,* 88 S.W.3d 47, 63 (Mo.App. W.D.2002) (emphasis added). The declarant's subjective belief of death " 'may be inferred from the declarant's condition and other circumstances which indicate his apprehension of imminent death.' " *Id.* (quoting *State v. Mahone,* 699 S.W.2d 60, 62 (Mo.App. E.D.1985)). If the declarant believes, based on his condition, that he will die almost immediately, that is sufficient to demonstrate the dying declaration exception to hearsay. *Id.*

Viewing the evidence in the light most favorable to the trial court's decision, the trial court did not abuse its discretion in allowing Hailey to testify to Terry's statement implicating Minner. At the time Hailey testified, the jury had previously heard testimony from Officer Tim Bartlett ("Bartlett"), who was one of the first officers to arrive at the scene, regarding the nature of the crime and the physical state of Terry. Bartlett testified, without objection, that the apartment was in total disarray, blood was spattered everywhere, and that in his nearly fourteen years of working in the law enforcement field he had never seen a crime scene like this one before. Bartlett also testified that Terry was bleeding heavily and appeared to be severely injured. This testimony permitted the trial court to reasonably infer Terry had an apprehension of imminent death.

Hailey also testified regarding his observations about the severity of Terry's injuries:

Q: When you got there, again, who did you see when you first went into the residence? Who did you see there?

A: When I first went into the room, there was two people laying in the front—one in the front room. He was identified as Mr. Terry. And then there was one laying in front of the refrigerator in the kitchen that was identified as Mr. Minner.

Q: All right. When you first went in there, what kind of condition was Mr. Terry in at that time?

A: He was wounded. He had a gunshot wound to the chest and then a wound to the head that later learned to be a gunshot wound. He was lying in blood.

Q: All right. How would you describe the condition of his appearance at that point in time?

A: He looked like he had been wounded severely. He was weak and he had kind of an ashen color.

This testimony corroborated Bartlett's testimony and also supported a reasonable inference that Terry believed his death was imminent. Hailey's testimony continued with a discussion of his efforts to secure information from Terry about his assailant:

Q: And did you approach Mr. Terry?

A: Yes, I did.

Q: And what was your discussion with him at that time?

A: I told him that it looked like he was dying and that—asked him who—who shot him.

Q: When you asked him that question what did he tell you about his—

A: He said

Mr. Kenyon: Excuse me. I'll object based on the previous motion.

The Court: Pardon?

Mr. Kenyon: I'm just offering a contemporaneous objection.

The Court: Objection will be overruled.

Q: What did he tell you about his—what he knew about his condition?

A: He said that the medics told him that he was dying and that he knew it.

Q: And what question did you ask him?

A: I asked him who shot him or who did this to him.

Q: And what—how did he respond?

A: He indicated the person in front of the refrigerator. I asked him if he knew his name and he said, No. And I said, Who did it? And he indicated the gentleman over there.

This testimony indicated Terry subjectively believed that his death was imminent and that there was no hope of recovery.

Minner contends that Terry "was not a man near death, whether he thought he was or not." To support this argument, Minner points to the fact that medics were not providing frantic treatment to Terry, they were not even with Terry at the time his statement was made to Hailey, and Terry did not volunteer statements to loved ones. Though Terry was severely wounded, Minner argues the scene described by Hailey was calm, more in keeping with a traditional interrogation. Based on these circumstances, Minner contends that it was not reasonable for Terry to believe he was dying. Of paramount importance to Minner's argument is the fact that Terry did not die soon after his statement. Minner essentially argues that a declarant's *stated belief* that death is imminent must be *objectively* reasonable. Minner also argues that even if Terry reasonably believed his death was imminent, there was no evidence Terry believed there was no hope of recovery. Minner's arguments are without merit.

█ A declarant's *subjective* belief that death is imminent is all that need be shown. *Hayes,* 88 S.W.3d at 63. It is true a trial court must evaluate whether the "declarant believed that his or her death was imminent and that there was no hope of recovery." *Id.* (citing *State v. Smith,* 32 S.W.3d 532, 547 (Mo. banc 2000)). However, " '[t]hese beliefs, *if in fact they are two separate beliefs rather than the same belief expressed differently,* may be inferred from the declarant's condition and other circumstances which indicate his apprehension of imminent death.' " *Id.* (quoting *Mahone,* 699 S.W.2d at 62) (emphasis added). The circumstances Minner described about the scene, along with testimony from officers about their observations regarding Terry's serious injuries and ashen appearance, were collectively relevant to the trial court's evaluation of

the condition of Terry's state of mind at the time of the declaration. Absent more, the trial court's determination that this evidence supported a reasonable inference that Terry believed he was dying would not have been an abuse of discretion. Here, however, the trial court had more— an affirmative statement from Terry that he believed his death was imminent. The trial court did not need to rely merely on the circumstances of the crime scene or on third party observations to attempt to discern Terry's state of mind. " 'The best method of proving the state of mind of the declarant, and one frequently not available, is his express statement concerning that state of mind.' " *Hayes*, 88 S.W.3d at 64 (quoting *State v. Liggins*, 725 S.W.2d 75, 76 (Mo.App. E.D.1987)).

The trial court's admission of Hailey's testimony concerning Terry's statement was not an abuse of discretion. The trial court's conclusion that Terry's statement was a dying declaration did not clearly go against the logic of the circumstances before the court. Minner's first argument under point one is denied.

### Confrontation Clause

■ We will now address for plain error Minner's contention that allowing Hailey to testify about Terry's dying declaration violated Minner's constitutional right to confront witnesses pursuant to the Confrontation Clause. As previously noted, plain error review first requires a showing that Minner's claim, on its face, establishes a substantial ground to find that manifest injustice or miscarriage of justice has resulted. We conclude Minner cannot establish this threshold prong for plain error review.

*Crawford* held that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amor-

phous notions of 'reliability.' " 541 U.S. at 61, 124 S.Ct. 1354. The United States Supreme Court thus concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69, 124 S.Ct. 1354. Thus, in examining hearsay in a criminal case, the first inquiry must be whether the hearsay is "testimonial." The definition of "testimonial" was purposefully not addressed by the court in *Crawford. Id.* at 53 n. 4, 124 S.Ct. 1354. The Court nonetheless comfortably concluded that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay. *Id.* at 53, 124 S.Ct. 1354. Terry's statement to Hailey was in response to Hailey's interrogation, or questioning, of him and was likely "testimonial hearsay." However, this does not end our inquiry under *Crawford,* because Terry's statement was a dying declaration.

To determine whether the Framers' intended to permit certain testimonial hearsay to remain admissible, the Court analyzed whether exceptions permitting testimonial hearsay against an accused in a criminal case existed prior to 1791, the year the Sixth Amendment was adopted. *Crawford,* 541 U.S. at 38–55, 124 S.Ct. 1354. The court noted:

> The one deviation we have found involved dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*

*Id.* at 56 n. 6, 124 S.Ct. 1354 (internal citations omitted). Thus, *Crawford* does not support exclusion of Terry's dying declaration to Hailey, even if that dying declaration is deemed to be testimonial hearsay. Minner acknowledges in his brief "that most, in fact nearly all, courts that have considered the impact of *Crawford* ... have held that dying declarations do not violate the Confrontation Clause." [8] In fact, the United States Supreme Court had occasion in *Giles v. California,* — U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) to discuss the dying declaration exception once again. Though *Giles* involved the scope of admissible hearsay under the forfeiture by wrongdoing doctrine in light of the Confrontation Clause, in addressing the dying declaration hearsay exception as a possible means of admitting the objectionable testimony, the court noted:

> We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. [Witness] did not make the unconfronted statements admitted at Giles' trial when she was dying, *so her statements do not fall within this historic exception.*

*Giles,* 128 S.Ct. at 2682–83 (internal citations omitted) (emphasis added). There is certainly nothing is this recent pronouncement which permits us to conclude that the United States Supreme Court has determined testimonial dying declarations to be inadmissible under the Confrontation Clause. We conclude that Minner's claim on its face does not establish substantial grounds to find that manifest injustice or miscarriage of justice has resulted. It is not plain error. Thus, we need not assess whether or not a miscarriage of justice or manifest injustice will occur if the alleged plain error is left uncorrected. Minner's second argument under point one is denied.[9]

## Point Two

In Minner's second point on appeal, Minner contends that the trial court erred in overruling his motion for judgment of acquittal and by entering judgment on the verdict of guilty of first degree murder. Minner contends that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that Minner caused Terry's death, because the evidence reflects that Terry had recovered from the gunshot wounds and died of an infection that was unrelated to the gunshot wounds.

"When considering a claim that alleges insufficient evidence to support a conviction, an appellate court's review is limited to determining whether the evidence is sufficient for a reasonable juror to find each element beyond a reasonable doubt." *State v. Blair,* 298 S.W.3d 38, 43 (Mo.App. W.D.2009). We must view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard any evidence to the contrary. *Id.* We do not weigh the evidence, nor do we judge witness credibility, as those are matters

---

**8.** The Eighth Circuit recently concluded that the Minnesota Supreme Court's holding that testimonial dying declarations are an exception to the *Crawford* analysis was not erroneous. *Martin v. Fanies,* 365 Fed.Appx. 736, 739, 2010 WL 582614 (8th Cir.2010).

**9.** Even if Minner had adequately preserved his objection to admission of Terry's dying declaration as a violation of his 6th Amendment rights pursuant to *Crawford,* our conclusion regarding the admissibility of the dying declaration would have been the same, notwithstanding the required *de novo* review, in light of our construction of *Crawford* and *Giles.*

left to the jury. *State v. Redifer,* 215 S.W.3d 725, 730 (Mo.App. W.D.2006).

### Analysis

"The elements of first degree murder are: (1) knowingly (2) causing the death of another (3) after deliberation on the matter." *Blair,* 298 S.W.3d at 44. Each element may be proved by circumstantial evidence, which is given the same weight as direct evidence. *Id.* at 45. In his second point on appeal, Minner contends that there was insufficient evidence from which a reasonable juror could have concluded that Minner caused Terry's death beyond a reasonable doubt. We disagree.

At trial Dr. Deidiker, the doctor who performed Terry's autopsy, testified to a reasonable degree of medical certainty that Terry's primary cause of death was due to complications from multiple gunshot wounds which resulted in multiple organ failure. Dr. Deidiker testified that the cirrhosis of Terry's liver, as well as his other health problems, weakened his body. He went on to testify that trauma, such as Terry's, in a relatively healthy individual may not be fatal, but the same trauma in "someone who has a significant amount of natural disease" could be fatal. He said that such individuals with disease may not have the capacity to take on additional physical injury. The doctor testified that he believed that is what happened to Terry: "The gunshot wounds added to the physiologic stress of someone who already had severe natural disease and that resulted in his organs failing and ultimately his death." Dr. Deidiker testified that "while the gunshot wounds themselves did not cause direct fatal injury to the organs the [sic] added stress to his body from those injuries ultimately pushed him over the edge—and his body was not able to compensate and recover from that."

Dr. Deidiker's testimony supports the conclusion that Terry caused Minner's death, and the jury was free to believe this testimony. As Minner concedes, " '[t]he unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause.' " *State v. Black,* 50 S.W.3d 778, 785 (Mo. banc 2001) (citations omitted). A person proximately causes the death of another, and hence is criminally culpable, where " 'the deceased was in feeble health and died from combined effects of the injury and of his disease, or if the injury accelerated the death from the disease ... although the injury alone would not have been fatal ... [and] although the disease itself would probably have been fatal, if the injury accelerated death.' " *State v. Hanes,* 729 S.W.2d 612, 617 (Mo.App. E.D.1987) (citations omitted).

Minner offered testimony from Dr. Nyachome who posited alternative explanations for Terry's death which he claimed were unrelated to and not exacerbated by Terry's multiple gunshot wounds. Principally, Dr. Nyachome testified that Terry's cause of death was infection unrelated to the gunshot wounds. Dr. Nyachome testified that Terry had, for all intents and purposes, recovered from the gunshots. Minner maintains that Dr. Nyachome's testimony proves that the second element of first degree murder—causing the death of another—was not established beyond a reasonable doubt.

Minner's argument ignores the fact that the jury was free to disbelieve the testimony of Dr. Nyachome or to view his testimony as less persuasive than the competing testimony of Dr. Deidiker. This is not a case where no evidence that Minner caused the death of Terry was presented to the jury. It is a case where competing evidence of Terry's cause of death was presented to the jury. Credibility and the weighing of conflicting evidence are mat-

ters for the jury to determine. *Redifer*, 215 S.W.3d at 730. Because we view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard any evidence to the contrary, we are left with the inescapable conclusion that the jury reasonably concluded that Minner caused Terry's death. Point two is denied.

### Point Three

In Minner's third point on appeal, Minner contends that the trial court erred in overruling Minner's motion for judgment of acquittal and by entering a judgment on the verdict of guilty of first degree murder. Minner contends that the evidence presented at trial was insufficient to establish beyond a reasonable doubt the third element of a first degree murder charge—deliberation. *Blair*, 298 S.W.3d at 44. Minner maintains that there was no cool reflection which would show deliberation because based on the State's theory Minner went to the home to kill or bribe Jennifer and not Terry. Our standard of review is the same as that employed in addressing Minner's second point on appeal.

### Analysis

■■■ "'Deliberation' means cool reflection for any length of time no matter how brief." Section 565.002(3). Whether deliberation exists is a matter for the jury to decide. *State v. Davis*, 914 S.W.2d 21, 22 (Mo.App. E.D.1995). Viewing the evidence in the light most favorable to the verdict there was sufficient evidence to permit a reasonable juror to conclude beyond a reasonable doubt that Minner deliberated on Terry's death.

The collective testimony of Bartlett, Hailey, and Jennifer established that Minner had, on several occasions prior to Terry's murder, approached Terry, not Jennifer, to attempt to pressure Terry into persuading Jennifer not to testify against Travis Williams. In addition to this testimony, Minner showed up at Terry's apartment with a gun. Minner shot through the front door of the apartment after Terry inquired about who was knocking. Once Minner broke through the front door, he confronted an injured Terry and proceeded to fight with him, shooting him two more times. Minner and Terry struggled again after Minner attacked Jennifer. Minner never withdrew and offered no evidence that he attempted to withdraw, unlike the second man Jennifer saw outside the apartment who apparently fled after Minner shot through the front door.

■■■ For purposes of first-degree murder, "'[d]eliberation may be inferred from the circumstances surrounding the murder.'" *State v. Miller*, 220 S.W.3d 862, 868 (Mo.App. W.D.2007) (quoting *State v. Jones*, 955 S.W.2d 5, 12 (Mo.App. W.D.1997)). Deliberation may be inferred from the fact that the defendant had the opportunity to terminate an attack after it began. *State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc 2002). "A prolonged struggle is evidence of deliberation. Deliberation may also be inferred when there are multiple wounds or repeated blows." *State v. Johnston*, 957 S.W.2d 734, 748 (Mo. banc 1997) (citations omitted). "'The deliberation necessary to support a conviction of first-degree murder need only be momentary; it is only necessary that the evidence show that the defendant considered taking another's life in a deliberate state of mind.'" *Miller*, 220 S.W.3d at 868 (quoting *Jones*, 955 S.W.2d at 12). "'A deliberate act is a free act of the will done in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of violent passion sud-

denly aroused by some provocation.'" *Id.* (quoting *Jones,* 955 S.W.2d at 12).

Minner suggests that since the State claims his altercation with Terry was motivated by a desire to silence Jennifer, the State cannot establish that Minner coolly reflected on killing Terry. This argument is not persuasive. Minner's intent to kill Jennifer does not foreclose the presence of deliberation, as supported by the reasonable inferences drawn from the evidence, in connection with Terry's death.[10]

Viewing the evidence in the light most favorable to the verdict, we find that the evidence was sufficient to support the jury's conclusion that Minner acted with deliberation. Point three is denied.

### Point Four

In Minner's final point on appeal, Minner contends that the trial court plainly erred in failing to *sua sponte* instruct the jury to disregard the prosecutor's improper closing argument impugning defense counsel's honesty. Minner concedes that he did not properly preserve this point on appeal and, therefore, requests plain error review pursuant to Rule 30.20. We have already described the two-step process for reviewing plain error. *Nibarger,* 304 S.W.3d at 201 .

### Analysis

 Minner contends that, during closing arguments, the prosecutor made improper references to defense counsel and impugned his honesty by stating that defense counsel was using deception. The three objectionable references are:

Facts have to be proven beyond a reasonable doubt, not credibility. Credibility is something you decide based on

everything you've heard. Don't get confused. That, folks, when it was suggested to you was deception.

. . . .

And another thing you need to be wary of is when you are listening to someone who's putting on a case, when you're listening to the defense, watch out for the tactics of deception. Those things—people exaggerate.

. . . .

So as you're looking at this—I'll make one last point and sit down. As you're looking at this case, what you must understand is that you must decide who's lying to you. Who has a reason to lie? Who's used the tactics of deception?

Personal attacks on defense counsel by the prosecutor are improper and objectionable, though such statements do not always require reversal. *State v. Reyes,* 108 S.W.3d 161, 170 (Mo.App. W.D.2003). However, when statements are " 'directed at the tactics or techniques of trial counsel rather than counsel's integrity or character' " the arguments are permissible. *Id.* (quoting *State v. O'Haver,* 33 S.W.3d 555, 563 (Mo. App. W.D.2000)). We conclude that the statements about which Minner complains were comments on the tactics and techniques of Minner's counsel and were, therefore, permissible.

 The prosecutor's first statement rebutted Minner's counsel's argument concerning the burden of proof for determining the credibility of a witness. Minner's counsel told the jury during closing argument that in order to believe Jennifer's testimony, they had to find Jennifer was telling the truth beyond a reasonable doubt. The State countered that this com-

---

**10.** Minner argues that this cannot be a case where his intent to kill Jennifer can be "transferred" to Terry. However, the State did not argue or instruct on transferred intent. The only question is whether the evidence, viewed in the light most favorable to the verdict, supported the jury's finding of deliberation in connection with Terry's death.

ment was not consistent with the jury instruction addressing determination of the credibility of witnesses. The State's suggestion that defense counsel's statement was deceptive was a comment on counsel's tactic, not counsel's integrity. *See, e.g. State v. Petary*, 781 S.W.2d 534, 541 (Mo. banc 1989), *rev'd on other grounds, Petary v. Missouri*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) (characterizing defense counsel as a magician distracting the jury from the facts permitted); *State v. O'Haver*, 33 S.W.3d 555, 563 (Mo.App. W.D.2000) (reference to "slick lawyering" directed to tactics and techniques, not counsel's character or integrity). Moreover, a "prosecutor has considerable leeway to make retaliatory arguments at closing." *State v. Sanchez*, 186 S.W.3d 260, 265 (Mo. banc 2006). "By attacking the credibility of the state's witnesses defense counsel invited a response from the state." *State v. Castillo*, 853 S.W.2d 381, 386 (Mo.App. E.D.1993).

The prosecutor's second and third statements responded to defense counsel's arguments in closing. Counsel argued that Terry had been lying when he identified Minner as his assailant. Counsel had also argued that there was cocaine in the Terry's apartment—cocaine that was never located. The State's second and third statements were made in the context of assisting the jury in using common sense as it attempted to sort out credibility issues. We do not believe the State's comments suggest anything about the character of defense counsel but are, rather, a mere comment on the strategy or tactics employed by the defense.

We conclude the State did not personally attack defense counsel during closing argument. There is no plain error. Even if the State's comments had been improper, we would be unable to conclude that the comments had a decisive effect on the outcome of the trial as to amount to mani-

fest injustice given the overwhelming evidence of Minner's guilt. *State v. Edwards*, 116 S.W.3d 511, 536–37 (Mo. banc 2003). Point four is denied.

## Conclusion

We affirm the trial court's judgment entered following a jury verdict convicting Minner of first degree murder, first degree assault, first degree burglary, and two counts of armed criminal action. The trial court did not abuse its discretion in admitting Terry's dying declaration, which implicated Minner. Affording plain error review, the admission of the dying declaration did not violate Minner's rights under the Confrontation Clause. The jury could reasonable infer from the evidence beyond a reasonable doubt that Minner caused Terry's death and acted with deliberation as to support his conviction for first degree murder. Affording plain error review, the State did not personally attack defense counsel or improperly comment on defense counsel's character during closing argument. We affirm.

All concur.